UNITED STATES of America, Appellee,

v.

Thomas K. DOHERTY,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Nelson E. BARNER,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Nicholas SALERNO,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Arthur J. PINO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Robert W. CLEMENTE, Sr.,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

John A. DELIERE,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Gerald W. CLEMENTE,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Frank RAY, Defendant, Appellant.

Nos. 87–1681, 87–1740, 87–1683, 87–1685,
87–1687, 87–1688, 87–1682,
87–1739, and 87–1686.

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1988.

Decided Feb. 1, 1989.

As Amended on Denial of Rehearings
March 16, 1989.

Richard M. Egbert, Boston, Mass., for defendant, appellant John A. Deliere.

George F. Gormley, by Appointment of the Court, with whom Ellen A. Howard and Gormley & Keefe, Boston, Mass., were on brief, for defendant, appellant Nicholas Salerno.

Frederic C. Harris, Waltham, Mass., and John Baccari, Reading, Mass., with whom Thomas C. Troy, by Appointment of the Court, and Law Offices of Troy and Baccari, Wakefield, Mass., were on brief, for defendant, appellant Thomas K. Doherty.

MaryEllen Kelleher, for defendant, appellant Arthur Pino.

Francis K. Morris, Southboro, Mass., with whom Thomas E. Finnerty, P.C., Boston, Mass., by Appointment of the Court, was on brief, for defendant, appellant Nelson E. Barner.

Thomas P. Noone, Malden, Mass., for defendant, appellant Robert W. Clemente, Sr.

Richard E. Bachman with whom Charles E. Chase and Hale, Sanderson, Byrnes & Morton, Boston, Mass., were on brief, for defendant, appellant Gerald W. Clemente.

Thomas J. May with whom Johnson, Mee & May and John J. O'Connor, Boston, Mass., were on brief, for defendant, appellant Frank Ray.

Robert S. Mueller, III, Deputy U.S. Atty., Weston, Mass., with whom Frank L.

McNamara, Jr., U.S. Atty., and Alexandra Leake, Asst. U.S. Atty., Boston, Mass., were on consolidated brief, for appellee.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

These eight appeals arise from a single prosecution, of nine Boston policemen and a state legislative aide, for conspiring to steal advance copies of civil service examinations and sell them to policemen so they could cheat and obtain promotions. These eight defendants appeal from convictions for conspiracy to commit mail fraud, racketeering, and perjury. *See* 18 U.S.C. § 371 (conspiracy), § 1341 (mail fraud), §§ 1961–68 (Racketeer Influenced and Corrupt Organizations Act (RICO)), and § 1623 (perjury). The most significant legal claim (advanced by five appellants) is that the Supreme Court's recent interpretation of the federal mail fraud statute, set forth in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), decided after the appellants' trial, shows that the government tried this case using an incorrect legal theory about "fraud." Appellants add that *McNally* therefore requires the government to try them again.

The appellants point out that the indictment and jury instructions in this case told the jury it could find them guilty of mail fraud conspiracy under the commonly accepted, pre-*McNally* theory that the statute's definition of mail fraud includes within its scope an effort fraudulently *to deprive citizens of honest public services.* In *McNally*, however, the Supreme Court held that this interpretation of the mail fraud statute, 18 U.S.C. § 1341, is not correct. It said that that statute "does not refer to the intangible right of the citizenry to good government." Rather, it protects only property rights; the "original impetus behind" the enactment of the statute was "to protect the people from schemes to deprive them of their money or property." *Id.* at 2879.

The pre-*McNally* indictment and jury instructions in this case contain language that *McNally* now holds to be erroneous. We have therefore read the record to determine whether the erroneous language prejudiced the defendants in any way. We have concluded, as did the district court in its post-trial, post-*McNally* review of the record, 675 F.Supp. 726, that the errors were harmless beyond any reasonable doubt. We therefore reject the appellants' *McNally* claims. For reasons that we shall elaborate, we reject all but one of the appellants' other legal claims as well.

## I. *Background*

To understand this case, the reader must keep in mind the following: First, the government charged (among other crimes) both a general conspiracy to violate the mail fraud statute and several subsidiary mail fraud conspiracies. It claimed that Gerald L. CLEMENTE was the mastermind of the whole scheme, a scheme to steal copies of examinations and sell them to policemen seeking promotions. (We shall print the names of appellants in capital letters to distinguish them from other witnesses and other participants.) Thomas K. DOHERTY, Nelson E. BARNER, and Nicholas SALERNO joined CLEMENTE in the general conspiracy. The government charged Arthur J. PINO, Frank RAY, John A. DELIERE, and Robert W. CLEMENTE (whom we shall refer to as R. CLEMENTE) with having participated in separate, subsidiary conspiracies to buy particular exams, which helped them obtain promotions.

Second, the mail fraud statute in question reads as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises ..., for the purpose of executing such scheme or artifice or attempting so to do ... knowingly causes [anything] to be delivered by mail ... shall be ... imprisoned not more than five years....

18 U.S.C. § 1341. The jury convicted six defendants of conspiring to violate this statute. 18 U.S.C. § 371 (forbidding conspiracies "to commit any offense against

the United States"). It also convicted one of these six of racketeering, and another for perjury. The remaining two appellants pled guilty, CLEMENTE to racketeering, and RAY to mail fraud conspiracy and perjury. Both CLEMENTE and RAY testified as witnesses at the trial of the others.

Third, appellants raise an unusually large number of separate legal arguments, almost all of which depend on a detailed examination of the record for their proper resolution. We shall discuss the record evidence and our reasoning in detail in respect to appellants' most important claims, those concerning *McNally* and the statute of limitations. We shall treat the remaining claims more briefly, indicating our reasons with no more than enough specificity to permit the appellants to understand the basis for our conclusions.

The evidence presented at trial consisted mainly of CLEMENTE's testimony. We shall summarize that evidence. Unless we indicate otherwise, its source is CLEMENTE's testimony:

1. CLEMENTE said that he was a Metropolitan District Commission (MDC) police officer, and an amateur locksmith. In 1976 and 1977, with the help of Richard Madden, an officer who patrolled the state's McCormack office building, CLEMENTE entered and explored the offices of the Massachusetts Department of Personnel Administration (MDPA). He learned where it kept police promotional examinations before the exams were given, and he made master keys to the locks. CLEMENTE said that DOHERTY helped him explore the MDPA offices and obtain access to the exams. CLEMENTE and DOHERTY then decided to make photocopies of upcoming exams, prepare answer sheets for the exams, and sell the exams with answers for $3000 each. Joseph Bangs, an MDC policeman, corroborated CLEMENTE's story by testifying that CLEMENTE told him he had access to the exams, as early as 1977.

2. CLEMENTE said that he and DOHERTY stole a copy of an October 21, 1977 Wilmington police sergeant exam, shortly before the exam was given. (Although CLEMENTE did not provide the exact dates when he stole various exams, other evidence showed that exam copies did not arrive at the McCormack building offices until a week or two before the exam date.) They sold the exam to Frank Thorpe, a Wilmington policeman. Thorpe testified that he bought the exam, and tried to resell it to a policeman named David McCue. McCue testified that he told his superiors about the attempt, and this led to an investigation by the state Attorney General's office.

3. CLEMENTE said that in early 1979 he entered the MDPA offices to look for information about the state investigation. He learned that the investigation "came up with nothing."

4. CLEMENTE said that he and DOHERTY stole copies of a March 3, 1979 Somerville police captain exam, an April 21, 1979 MDC sergeant exam, and an April 21, 1979 statewide sergeant exam. (On statewide exams, applicants could choose which towns' police departments, and which open positions, they wished to apply for.) They sold the Somerville exam to Arthur PINO. They gave or sold the MDC exam to Joseph Bangs, Robert CLEMENTE (Gerald's brother), Richard Nazzaro, Frederick Lebert, and Robert Spencer. Bangs testified that he paid CLEMENTE $3000 for his own exam and $3000 for Spencer's. DOHERTY himself took the statewide exam, got a high score, and obtained a promotion to sergeant in the Medford police force.

5. CLEMENTE said that, shortly after the MDC examination took place, he and Bangs entered the MDPA offices and raised the scores on exams taken by officers they liked (including Bangs' score) and lowered the scores of several others, including the scores of several black officers.

6. CLEMENTE said that he and DOHERTY stole an August 9, 1979, Revere police chief exam and a September 8, 1979 statewide exam for promotions to various police ranks. They sold copies of the statewide examination to Nelson BARNER, Richard Feeny, and William O'Brien. They sold both examinations to John DELIERE. DELIERE resold the statewide examination to Edward Sasso. CLEMENTE said

he told DELIERE to warn Sasso to miss a few questions. When CLEMENTE learned Sasso had not done this, he entered the MDPA offices and lowered Sasso's score. CLEMENTE and DOHERTY also took the statewide exam themselves.

7. CLEMENTE said he sold an October 17, 1981, Capitol Police captain examination to Richard Madden. He said he sold an April 23, 1983, statewide sergeant and lieutenant examination to Joseph Bangs, Nicholas SALERNO, William Gilbert, Richard Nazzaro, and Frederick Lebert. Gilbert corroborated CLEMENTE's testimony about the April exam. Also, CLEMENTE and Bangs testified that CLEMENTE entered the MDPA offices to file and backdate Bangs' exam application, which Bangs had not sent in on time. Bangs took the exam, and obtained a promotion to MDC police lieutenant. CLEMENTE said he also gave a copy of the April 23 exam to DOHERTY, who used it to obtain a promotion to Medford police lieutenant.

8. CLEMENTE said he stole an October 1983 statewide police entrance exam, which he sold to SALERNO and to Frank RAY. CLEMENTE said that RAY said he wanted to give the exam to his son-in-law, Robert Mello. Mello testified that he received the exam from RAY, took the exam, and the Somerville police department hired him.

9. CLEMENTE summarized his activities by stating that, between 1978 and 1984, he and DOHERTY stole and distributed advance copies of 20 to 25 police promotional examinations. They often gave copies of a single exam to more than one applicant. When they sold exams, they normally charged $3000 and split the money. CLEMENTE said his only purpose was to make money. Bangs, however, testified that CLEMENTE also wanted to build a network of police officers who would owe him favors.

10. CLEMENTE said that his scheme ended in October 1984, when, in DOHERTY's presence, a policeman named John Gillen got into an argument with Bangs and shot him, in a barn behind DOHERTY's house. Police officers subsequently searched the barn, looking for evidence re-lated to the shooting. They found a copy of an April 1984 examination. When CLEMENTE learned about this discovery, he destroyed all the examination material he had, disposed of his MDPA keys, and never again entered the MDPA offices.

11. CLEMENTE also testified about two other defendants, Nelson BARNER and Nicholas SALERNO, whom the government charged with having taken part in the general conspiracy.

a. CLEMENTE said that BARNER, an MDC police officer, helped him research answers to a stolen police chief examination in 1978. He said that, subsequently, he often called upon BARNER for help in preparing answer sheets for stolen exams. Bangs and Barbara Hickey, CLEMENTE's girl friend, testified that they often heard CLEMENTE talking on the phone to BARNER about exam answers. CLEMENTE also said that BARNER once helped him photocopy exams in the MDPA offices, and that BARNER used a stolen exam in 1979 to obtain a promotion to police captain.

b. CLEMENTE said that Nicholas SALERNO, a state legislative aide and the uncle of Joseph Bangs, asked CLEMENTE in 1979 if he could obtain copies of promotional examinations. CLEMENTE said he agreed to sell SALERNO exams for $3000 each, he sold SALERNO fifteen to twenty exams between 1979 and 1984, and these exams included the exam that the police later found in DOHERTY's barn. Bangs also testified that, several times between 1979 and 1984, CLEMENTE asked him for advice on which applicants he should offer to sell exams to.

12. CLEMENTE also testified about the subsidiary conspiracies that the government charged:

a. CLEMENTE said that Somerville police officer Arthur PINO bought an examination in March 1979 and used it to obtain a promotion to Somerville police captain. CLEMENTE said that retired police officer Frank RAY acted as an intermediary, asking for the exam, giving the exam to PINO, and also asking CLEMENTE to raise PINO's score after he took the exam, which CLEMENTE did. CLEMENTE add-

ed that he later asked PINO for various favors, which PINO gave him. In 1979 PINO and RAY helped remodel CLEMENTE's kitchen; in 1980 PINO helped CLEMENTE find out whether certain "organized crime figures" intended to retaliate against him (for activity not relevant here); in 1981 CLEMENTE asked PINO to help a friend obtain city auto towing contracts. RAY corroborated much of CLEMENTE's testimony, adding that PINO helped RAY's son-in-law Robert Mello get a city job in 1982.

b. CLEMENTE said he gave his brother, MDC police officer Robert CLEMENTE, copies of the April 1979 MDC sergeant exam and the April 1983 statewide police lieutenant exam. He said that R. CLEMENTE used these exams to obtain promotions, first to sergeant and then to lieutenant.

c. CLEMENTE said he sold Revere police officer John DELIERE copies of an August 9, 1979, Revere police chief examination and a September 8, 1979, captain examination. He said that DELIERE used the chief's exam to obtain a promotion to Revere police chief.

Although, as we have indicated, the government's case, for the most part, consisted of CLEMENTE's testimony, the government did present various corroborating witnesses, including RAY, Madden, Bangs, and CLEMENTE's girl friend Barbara Hickey, who witnessed several transactions. The government also called technical witnesses to describe the exam process and exam scores, and it called a fingerprint expert to testify that DOHERTY left his fingerprints in the MDPA offices.

The defendants presented no witnesses. Rather, they concentrated on impeaching CLEMENTE's, and the other witnesses', testimony. Through cross-examination they brought out the fact that CLEMENTE had engaged in considerable criminal activity. He had participated in a $15 million theft of money and jewels, and he had engaged in tax fraud, insurance fraud, pension fraud, and perjury. Bangs admitted that he, too, was involved in the $15 million theft. Cross examination of RAY produc-

ed evidence of his involvement in perjury, tax fraud, insurance fraud, and possession of a stolen van. Hickey admitted that she had lied before the grand jury.

The jury convicted DOHERTY, BARNER, and SALERNO of participating with CLEMENTE in the general mail fraud conspiracy charged as Count One. The jury also convicted DOHERTY of racketeering, and BARNER of having given perjured testimony before the grand jury. The jury convicted PINO of participating in a subsidiary mail fraud conspiracy (Count Three of the indictment); R. CLEMENTE, of participating in two subsidiary mail fraud conspiracies, relating to each exam he took (Counts Five and Seven); and DELIERE, of participating in one subsidiary mail fraud conspiracy (Count Six). All these defendants appeal their convictions.

In addition, as we previously mentioned, the government entered into plea agreements with CLEMENTE and RAY. CLEMENTE pled guilty to one racketeering count. RAY pled guilty to a charge of involvement in a subsidiary mail fraud conspiracy (Count Three) and a charge of giving perjured testimony before the grand jury. CLEMENTE appeals from the court's sentencing decision; RAY appeals from the court's denial of a habeas corpus petition in which he asked the court to set aside his guilty plea. (We have made charts, set out as Appendices A and B, to help the reader keep track of the convictions by appellant and by crime.)

## II. The McNally Issue

Five appellants, two convicted of participating in the general conspiracy (DOHERTY and SALERNO) and three convicted of participating in subsidiary conspiracies (PINO, DELIERE and R. CLEMENTE), argue that the Supreme Court's recent McNally decision requires us to overturn their convictions. CLEMENTE and RAY do not make this argument directly because they pled guilty, but RAY indirectly raises the McNally claim in seeking to have his guilty plea set aside. The eighth appellant, BARNER, does not make this argument to this court because the district

court accepted his *McNally* argument and granted him a new trial on his conspiracy conviction.

The argument, as we have previously mentioned, runs as follows: The mail fraud statute makes it illegal to use the mails to help carry out "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." § 1341. Before *McNally*, prosecutors commonly charged defendants with mail fraud conspiracies to defraud citizens of their "right to honest government." But the Supreme Court in *McNally* found this broad use of the mail fraud statute improper. It held that the statute protects only "property rights," not "the intangible right of the citizenry to good government." *McNally*, 107 S.Ct. at 2879. Although the trial in this case took place before the Supreme Court decided *McNally*, we must apply *McNally* on this appeal. *Griffith v. Kentucky*, 479 U.S. 314, 323, 107 S.Ct. 708, 713–14, 93 L.Ed.2d 649 (1987). Appellants argue that, given *McNally*, (1) the indictment is legally defective, and (2) the district court erroneously instructed the jury about the elements of mail fraud. We shall consider each of these claims in turn.

### A. *The Indictments*

We agree with the appellants that the indictment charged them, in part, with conspiring to violate the mail fraud statute *by depriving citizens of intangible rights to good government*, a charge that *McNally* says does not properly reflect the meaning of the mail fraud statute. That fact, however, is not sufficient automatically to invalidate the indictment. It shows only that a *part* of the indictment, not the *whole* indictment, is invalid.

■ An indictment may charge a crime by claiming that the defendant violated a statute in several different ways. *See United States v. Miller*, 471 U.S. 130, 134, 105 S.Ct. 1811, 1814, 85 L.Ed.2d 99 (1985) (indictment properly charged violations of § 1341 by setting forth "a number of ways in which the acts alleged constituted violations"). A jury need not believe that the defendant did *everything* the indictment

charges; it may convict if it believes he did some of the things the indictment charges and if those things, by themselves, amount to a violation of the statute. *Id.* (conviction proper because the facts proved at trial conformed to "one of the theories of the offense" contained in the indictment). The proof that underlies the conviction must

> correspond[ ] to an offense that was clearly set out in the indictment. A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a "useless averment" that "may be ignored."

*Id.*, 471 U.S. at 136, 105 S.Ct. at 1815, quoting *Ford v. United States*, 273 U.S. 593, 602, 47 S.Ct. 531, 534, 71 L.Ed. 793 (1927). Thus, in *United States v. Ochs*, 842 F.2d 515, 527–28 (1st Cir.1988), this court upheld an indictment that charged the defendants with conspiring to defraud (a) the city of Boston of $12,000 in building permit fees; (b) *the citizens of Boston of their right to honest government;* and (c) private parties of legal fees through "double-billing." Even though, after *McNally*, charge (b) no longer stated a violation of the mail fraud statute, (a) and (c) continued to do so. *See also United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir.1988) (indictment charging scheme to defraud county and EPA of right to honest bidding process valid because it also charged that the scheme was intended to deprive them of money).

■ Of course, after excising the invalid portions of an indictment, the revised indictment must still, as the Constitution requires, describe the "offense ... with sufficient clarity to show a violation of law" and enable "the accused to know the nature and cause of the accusation against him and to plead an acquittal or conviction in bar of future prosecution for the same offense." *United States v. Fusaro*, 708 F.2d 17, 23 (1st Cir.), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

■ We believe the indictment in this case satisfies these tests. It *invalidly* charges a conspiracy to defraud citizens of their right to honest government, but it

also validly charges a conspiracy to defraud the government of money. Count One, the general mail fraud conspiracy, invalidly says that the conspirators "devised" a scheme "to defraud ... Massachusetts and its citizens of their right to the loyal, faithful and honest services" of certain named policemen, and of their right to have "promotional examinations, and law enforcement appointments and promotions, conducted honestly;" and that they "devised" a scheme "to defraud" other applicants of their right to have promotions and examinations "conducted honestly." But Count One also *validly* says that it was a

> further objective of the conspiracy for the conspirators to illegally assist relatives, friends and associates in obtaining appointment to or promotion within police departments in the Commonwealth of Massachusetts so that those relatives, friends and associates would receive the benefits of such appointment or promotion; which benefits included the salary or increased salary by reason of appointment to or promotion within the police department and whatever pension benefits would accrue by reason of the appointment to or promotion within the police department.

The other, subsidiary mail fraud conspiracy counts contain similar language.

Count Three *invalidly* charges that PINO and RAY conspired (with CLEMENTE) to defraud citizens of various "good government" rights; but Count Three also *validly* says that it was

> a further objective of the conspiracy that defendant ARTHUR J. PINO be promoted to captain in the Somerville Police Department and thereby receive the benefits of such promotion, which benefits included the increased salary and pension benefits accruing by reason of that promotion.

Count Five asserts, in respect to a conspiracy involving R. CLEMENTE and CLEMENTE, that it was

> a further objective of the conspiracy that defendant ROBERT W. CLEMENTE, SR. be promoted to the rank of sergeant in the MDC Police Department and there-

by receive the benefits of such promotion, which benefits included the increased salary and pension benefits accruing by reason of that promotion.

Count Seven contains virtually identical language in respect to R. CLEMENTE's promotion to MDC captain. Count Six asserts, in respect to a conspiracy involving DELIERE and CLEMENTE, that it was

> a further objective of the conspiracy that defendant JOHN A. DELIERE be promoted to chief of the Revere Police Department and thereby receive the benefits of such promotion, which benefits included the increased salary and pension benefits accruing by reason of that promotion.

In our view, this language is sufficient to charge a valid conspiracy to defraud the Commonwealth of "money or property," namely, a scheme "for obtaining" the money used to pay the salaries of those improperly promoted "by means of false or fraudulent pretenses." 18 U.S.C. § 1341.

Whether the "excised" indictment, *i.e.,* the valid portions of the indictment standing alone, states a violation of law with constitutionally sufficient clarity, *see Fusaro*, 708 F.2d at 23, raises a slightly more difficult question. On the one hand, the quoted language begins with the words "a *further* objective." That fact, and the position of this language on the indictment page could lead a reader to believe that "salary" was a minor matter, not at the heart of the conspiracy. On the other hand, the language clearly states that money was *an* objective. Moreover, the indictment lists in detail the factual events in which the defendants allegedly participated, and that list of events makes it clear that the conspirators were after money, by obtaining promotions and raises through fraud (or helping others to obtain them, for a fee).

Further, none of these appellants have given us any reason to believe that clearer language, or more prominent placement on the page of the allegations concerning promotions, could have led them to prepare any different defense. They have not shown that increased clarity, or the omis-

sion of the "citizens' rights" language, could have made any significant difference to their efforts to prepare for trial.

This indictment, in our view, more closely resembles those post-*McNally* cases that have upheld pre-*McNally* indictments than those that have struck them down. *Compare Ochs, supra; United States v. Wellman*, 830 F.2d 1453, 1463 (7th Cir.1987) (indictment containing intangible rights language upheld because "the government could not logically prove" the intangible rights violations without proving the scheme involving money, since the factual elements of the two were identical, and because the "specific conduct alleged in the indictment is clearly proscribed by the mail fraud statute") *with United States v. Huls*, 841 F.2d 109, 110–12 (5th Cir.1988) (indictment alleging deceit about conflicts of interest struck down because it failed to allege a fraud of money or property); *United States v. Baldinger*, 838 F.2d 176, 180–81 (6th Cir.1988) (indictment charging dissemination of false business information about a competitor, but not alleging economic harm, insufficient in light of *McNally*); *United States v. Murphy*, 836 F.2d 248, 254 (6th Cir.1988) (indictment charging violation of state's right to accurate information regarding issuance of permits insufficient in light of *McNally*).

In sum, we believe that the indictment adequately charged the defendants with the crime of conspiring to commit a mail fraud to obtain money or property, as the Supreme Court interpreted the mail fraud statute in *McNally*.

## B. *The Jury Instructions*

■ The district court gave the jury pre-*McNally* instructions on the meaning of mail fraud. Although it told the jury that, "in effect," the scheme charged was one "of obtaining and then *selling* civil service examinations," (emphasis added) the court specifically instructed the jury that the government had charged a conspiracy to deprive citizens of their right to honest police services. It also told the jury that a "scheme or artifice to defraud" means

some plan or course of conduct to perpetrate a fraud upon another.... What is necessary is that the scheme be reasonably calculated to deceive other people. *The object of the scheme need not be money or any form of tangible property.* A scheme to defraud the citizens of Massachusetts or other law enforcement officers can come within the meaning of the statute which speaks of a scheme or artifice to defraud.

(Emphasis added.) Moreover, the court did not tell the jury it could convict if it found *either* an intangible rights conspiracy *or* a conspiracy fraudulently to obtain "money or property," although the government asked for the latter instruction. (The court had apparently accepted the government's proposed instruction concerning "a scheme ... to obtain money and property by means of false or fraudulent pretenses," but it did not include this language in the charge. When the prosecutor pointed out the oversight, the court said "I think it's covered by other language," and declined to supplement the jury charge.)

■ Although it is understandable, in light of the law at the time, why the court charged as it did, it is plain after *McNally* that the charge was erroneous. We must overturn the convictions if this instruction could have led the jury to convict " 'for conduct outside the proscription of the mail fraud statute.' " *Ochs*, 842 F.2d at 521 quoting *United States v. Piccolo*, 835 F.2d 517, 519 (3d Cir.1987). To overturn the convictions, however, it is not enough to conclude that the instructions were erroneous; we must also decide whether the error was harmless. *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct.1918, 1922 & n. 7, 95 L.Ed.2d 439 (1987) (despite erroneous charge on crucial element of offense, convictions should stand if "no rational juror" could have failed to find that element, if properly instructed; disapproving prior cases suggesting that such error automatically requires reversal); *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986) (conviction may stand despite erroneous instruction shifting burden of proof on an element of the crime, if "a reviewing court can find that the record

developed at trial establishes guilt beyond a reasonable doubt"). Because an erroneous instruction on an essential element of the crime is an error of constitutional dimension, we must ask not only whether the error was harmless under the ordinary Fed.R.Crim.P. 52(a) test, but whether it was harmless "beyond a reasonable doubt." *Pope,* 107 S.Ct. at 1922; *Rose,* 478 U.S. at 576–79, 106 S.Ct. at 3105–07; *see Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). An erroneous instruction on an element of the offense can be harmless beyond a reasonable doubt, if, given the factual circumstances of the case, the jury could not have found the defendant guilty without making the proper factual finding as to that element. *See Willard v. People of State of California,* 812 F.2d 461, 464 (9th Cir.1987) (failure to give specific intent instruction in aiding and abetting prosecution, even if it "relieved the state of its constitutional burden to prove all elements of the offense beyond a reasonable doubt," was harmless error in light of evidence and jury verdict); *United States v. Bollinger,* 796 F.2d 1394, 1403–04 (11th Cir.1986) (failure properly to define "acting in concert," under a certain statute, as requiring conspiracy with five or more persons, was harmless in light of the evidence and jury verdict); *United States v. Grayson,* 795 F.2d 278, 290 (3d Cir.1986) (trial court's failure to instruct that the jury must find RICO predicate acts "interrelated" was harmless error in light of the evidence and jury verdict).

The district court ruled, after the trial and after the Supreme Court decided *McNally,* that, except in the case of BARNER, the error in its pre-*McNally* instructions was harmless, that, in context, it could not have had any significant impact upon the jury. The district court said that the error was not only harmless error under Rule 52(a), but indeed it was "harmless beyond a reasonable doubt," citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *U.S. v. Doherty,* 675 F.Supp. 726, 734 (D.Mass.1987).

To decide whether the district court was correct in its assessment, we have reviewed the entire record in this case. We have considered the likely impact of the error on the minds of the jurors. *See Kotteakos v. United States,* 328 U.S. 750, 763–64, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946). We have asked ourselves whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [jurors'] judgment was not substantially swayed by the error." *Id.* at 765, 66 S.Ct. at 1248, *quoted in United States v. Mazza,* 792 F.2d 1210, 1216–17 (1st Cir.1986). After conducting this review, we have concluded that the district court's ruling was legally correct.

We find the error harmless, indeed harmless beyond any reasonable doubt, because we believe it virtually inconceivable that the jury could have found these appellants guilty of conspiracy to commit mail fraud without believing that they were conspiring to deprive the Commonwealth of money, in the form of salary payments to improperly promoted officers. We have set forth the basic evidence in Part I of this opinion. We can understand that a jury might have disbelieved the government's witnesses, but such a jury would have acquitted the defendants. We cannot understand how a jury, *believing* the government's account of the scheme to the extent of finding these appellants guilty, could, at the same time, have *not* believed that an object of the conspiracies was to obtain promotions and raises. The scheme CLEMENTE and the other witnesses described simply *was* a scheme dishonestly to obtain, and to help others obtain, promotions. Only one type of scheme was proven, a scheme to steal, sell, and use exams; the alleged intangible rights violations were predicated on this scheme. A finding that the defendants participated in this scheme logically entails a belief that they conspired to steal, sell, and use the exams to obtain promotions and raises through fraud.

The record shows that the case before us is similar to *Perholtz v. United States,* 836 F.2d 554 (D.C.Cir.1988), in which the government charged a fraud aimed at (1) depriving the federal Small Business Administration of money through a kickback

scheme, and (2) depriving the SBA of its "intangible right" to conduct business free of corruption. In upholding the convictions in the face of a post-*McNally* challenge, the D.C. Circuit wrote

> The scheme can be characterized as an "intangible rights" scheme only in the following sense: appellants, by defrauding the SBA of money through kickbacks, can be said by virtue of that very act of defrauding to be at the same time defrauding the SBA of [intangible rights].... The indictment did not allege any scheme ... other than the kickback scheme, and it is inconceivable that the jury could have disregarded the alleged kickback scheme.

*Id.* at 559. If we substitute the words "dishonest promotion scheme" for the words "kickback scheme," the D.C. Circuit's observation would apply here. *See also United States v. Piccolo*, 835 F.2d 517, 519 (3d Cir.1987) (upholding conviction despite intangible rights instruction because other parts of the jury charge referred to the scheme as one to obtain money); *Wellman*, 830 F.2d at 1463 (upholding conviction because "the proof in this case removes any doubt regarding the nature of the scheme" as one to obtain money).

There is, however, one important difference between this case and *Perholtz*. In that case, the monetary fraud and intangible rights theories were both included in the jury charge, as alternative bases for a guilty verdict; the jury heard both a permissible and an impermissible theory of prosecution. Here, instead, the court explained only the erroneous intangible rights theory. Thus, we must analyze this case as one where the instructions wrongly define an essential element of the offense. But, as we have said, harmless error analysis still applies, *see Pope*, 107 S.Ct. at 1922, and we have found the error harmless beyond a reasonable doubt.

This case differs from *Ochs, supra*, where the court found that the jury might have disbelieved the evidence showing a scheme to defraud the victims of property, and might have convicted the appellants on an intangible rights theory alone. The

government in that case accused the defendants, an attorney and a real estate investor, of conspiring with a Boston city official to use an artificially low construction cost figure in a building permit application, thereby lowering the permit fee, and to split the savings with the city official. The defendant attorney profited from the scheme by submitting inflated bills for legal services to the investment partnership.

This court found that, according to the proof at trial, the jury might have thought the lower construction cost figure and the legal bills were legitimate, but nonetheless convicted the defendants for conspiring to deprive the city and its citizens of honest government (by bribing the city official). That is, the intangible rights theory was an *alternative* to the theories involving monetary fraud, not merely a consequence of those theories. Therefore, it was conceivable, given the facts in *Ochs*, that the incorrect instruction made a practical difference in the verdict.

The case of one of the defendants here, BARNER, might be similar to that of the *Ochs* defendants. The evidence showed only that he helped research answers, so the jury might conceivably have thought the evidence insufficient to show that BARNER intended to defraud the state of salary payments; it might have convicted him on the alternative theory that he intended only to defraud the citizens of an honest system of police promotions. But in his case, the district court granted a new trial. Of the five appellants who now raise the *McNally* claim, however, the evidence showing their guilt also shows that four of them received promotions themselves through fraud, and that the fifth, SALERNO, bought and resold numerous exams to applicants; the success of SALERNO's resale operation clearly depended on the success of those applicants in getting promotions. No rational jury could have found these five appellants guilty without inferring that they intended to defraud the state of salary payments. Hence, this is a case where we can conclude, beyond a reasonable doubt, that "a verdict based on any ground would mean that the jury found

every element necessary to support a conviction on the sufficient ground." *Ochs,* 842 F.2d at 520, citing *United States v. Jacobs,* 475 F.2d 270, 283–84 (2d Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 131, 38 L.Ed.2d 53 (1973).

Appellants argue, further, that a scheme to obtain promotions by cheating on exams is not a scheme to deprive the Commonwealth of money or property, because the police departments would have paid the salaries to *some* candidate anyway, and the government made no showing that appellants failed to deliver the police services for which they they were paid. However, 18 U.S.C. § 1341 forbids schemes to defraud *or* to obtain money by false pretenses; this statutory language suggests no requirement that the scheme must be aimed at money which would not otherwise have gone to someone who honestly obtained the victim's business. Getting jobs by false pretenses falls within the prohibition of § 1341 because it "deprived" the Commonwealth "of control over how its money was spent." *McNally,* 107 S.Ct. at 2882; *see also United States v. Cooper,* 677 F.Supp. 778, 781 (D.Del.1988); *United States v. Biaggi,* 675 F.Supp. 790, 801–02 (S.D.N.Y. 1987). Unlike the situation in *McNally,* where "there was nothing in the jury charge that required" a finding that the defendants obtained money by "false representations," and thus deprived the victim of control over its money, *id.* 107 S.Ct. at 2882, here, the jury had to have found that defendants obtained or helped others obtain promotions by pretending that they had honestly received high exam scores.

We conclude that the district court properly refused to grant new trials to the appellants now before us.

### C. *Related Claims*

Our conclusion disposes of several other points raised by appellants DOHERTY and RAY. DOHERTY argues that we must set aside his RICO conviction because the jury, to find the "pattern of racketeering activity" required by § 1962, had to find that he participated in a mail fraud conspiracy. He says the improper mail fraud instruction

invalidates his RICO conviction. We have just concluded that the error in the instructions was harmless in respect to the mail fraud conspiracy convictions. For similar reasons we find it harmless in respect to DOHERTY's RICO conviction.

Appellant RAY, who pled guilty to mail fraud conspiracy and perjury, argues that the district court should have granted his habeas corpus petition to set aside his guilty plea to mail fraud conspiracy, on the ground that the indictment to which he pled guilty did not properly charge mail fraud. For the reasons set out at pp. 55–57, *supra,* however, we find the indictment legally adequate to set forth a violation of the statute, even after *McNally.* RAY also sought to have his guilty plea to perjury before the grand jury set aside, on the ground that, after *McNally,* what the grand jury was investigating was no longer the crime of mail fraud. This argument also fails, however, because the scheme investigated, charged, and proved at trial is, for the reasons we have set out, a conspiracy to commit mail fraud within *McNally*'s definition of that crime.

### III. *The Statute of Limitations*

Appellants PINO, DELIERE, and R. CLEMENTE (in respect to his promotion to sergeant) argue that the five year statute of limitations, 18 U.S.C. § 3282, bars their "subsidiary conspiracy" convictions. They say that the district court should have dismissed the indictment or granted their motions for judgment of acquittal, because all the overt acts that the government charged and proved took place more than five years before July 29, 1986, the date of the indictment. *See Grunewald v. United States,* 353 U.S. 391, 396–97, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957) (statute of limitations runs from date of last overt act in furtherance of conspiracy); *United States v. Read,* 658 F.2d 1225, 1232 (7th Cir.1981) (government must prove that the conspiracy existed, the defendant was still a member of it, and at least one overt act occurred, within five years of date of indictment). They concede that the indictment charged that the conspiracies continued up

to the date of indictment. And, the evidence is sufficient to show (1) that each of them, though promoted in 1979, received increased salary payments due to the promotions after the relevant date of July 29, 1981 (five years before indictment), and (2) that obtaining this increase in salary was an object of the conspiracy. The legal question is simply whether each defendant's receipt of salary payments after July 1981 can count as an "overt act" for statute of limitations purposes.

The government argues that a conspiracy stays in existence until its object is achieved. Here the object in part was to obtain salary, and so each act of receiving salary is a new "overt act." (Presumably, in the government's view, if one successfully conspires to obtain a lifetime annuity through fraud, each monthly payment until the conspirator's death would constitute an overt act.) The government points to a line of cases that offer support for this proposition. *See United States v. Girard*, 744 F.2d 1170, 1172–73 (5th Cir.1984) (bid rigging conspiracy lasted beyond the award of the contract, until the conspirators received the final contract payment); *United States v. Helmich*, 704 F.2d 547, 549 (11th Cir. 1983) (although defendant had not transmitted secret information since 1964, conspiracy to commit espionage lasted until defendant collected final payment in 1981); *United States v. Mennuti*, 679 F.2d 1032, 1035 (2nd Cir.1982) (conspiracy continued until conspirator received his anticipated payoff, a chance to buy property at bargain price); *United States v. Walker*, 653 F.2d 1343, 1349–50 (9th Cir.1981) (conspiracy continued until conspirators realized and divided up profits from fraudulently obtained timber contract).

We cannot accept the government's view, however, without qualification. It may seem reasonable to say that the act of receiving a conspiratorial objective is part of the conspiracy, where the receiving consists of one action, or a handful of actions, taking place over a limited period of time, or where some evidence exists that the special dangers attendant to conspiracies, the dangers of "concerted" activity and "group association" for criminal purposes,

remain present until the payoff is received. *See Callanan v. United States*, 364 U.S. 587, 593–94, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961) (collective criminal agreement, partnership in crime, presents greater threat to the public than individual criminality; concerted action increases the chance that the criminals will go through with their plan, succeed, and not get caught, and makes more complex crimes possible); *United States v. Escobar de Bright*, 742 F.2d 1196, 1199 (9th Cir.1984) (rationale behind making conspiracy a crime is that group criminality poses greater risks to society); *Developments in the Law—Criminal Conspiracy*, 72 Harv.L. Rev. 920, 923–25 (1959) (rationale of conspiracy is that "collective action toward an antisocial end involves a greater risk to society than individual action toward the same end").

But, where receiving the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, such as receiving salary payments, *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place, we do not see how one can reasonably say that the conspiracy continues. Rather, in these latter circumstances, one would ordinarily view the receipt of payments merely as the "result" of the conspiracy. That is what the Supreme Court suggested in *Fiswick v. United States*, when it wrote:

Though the result of a conspiracy may be continuing, the conspiracy itself does not thereby become a continuing one. Continuity of action to produce the unlawful result, or ... "continuous cooperation of the coconspirators to keep it up," is necessary.

329 U.S. 211, 216, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946) (citations omitted), quoting *United States v. Kissel*, 218 U.S. 601, 607, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910). And, each of the cases the government has cited, *see* p. 61, *supra*, is consistent with this approach. In each of those cases, the receipt of payment was one or a few discrete events, not an indefinite series con-

tinuing long after any active cooperation ceased. Also, in most of those cases, more than unilateral activity was at issue, for the payoff itself required cooperation; for instance, in *Helmich*, 704 F.2d at 548, the spy was paid by coconspirators, and in *Walker*, 653 F.2d at 1347, the realization and division of profits required "continuing cooperation." We cannot read these cases as extending the conspiracy statute of limitations indefinitely beyond the period when the unique threats to society posed by a conspiracy are present. To do so "would for all practical purposes wipe out the statute of limitations in [this kind of] conspiracy cases ..." *Grunewald*, 353 U.S. at 402, 77 S.Ct. at 972; *see also United States v. Habig*, 390 U.S. 222, 227, 88 S.Ct. 926, 929, 19 L.Ed.2d 1055 (1968) (criminal statutes of limitations are to be liberally construed in favor of repose). In applying the principle we set forth in the last paragraph to PINO, DELIERE, and R. CLEMENTE, we find that all three received their promotions in 1979 (PINO to captain, DELIERE to chief, and R. CLEMENTE to sergeant). All three received a continuing series of increased salary payments, extending beyond July 1981. The record contains evidence, however, in respect to PINO and DELIERE that they received their post–1981 salary payments in the context of a continued risk of concerted activity. The record contains no such evidence in respect to R. CLEMENTE.

The evidence as to PINO and DELIERE concerns favors they agreed to provide in return for advance copies of examinations. The government charged in the indictment that PINO and RAY conspired with CLEMENTE, for PINO to receive advance copies of exams "in return for services and favors." CLEMENTE testified that in 1979 PINO helped him remodel his kitchen, in 1980 PINO provided him with confidential police information, in 1981 CLEMENTE asked PINO to help obtain city towing contracts for a friend, and in 1982 PINO helped RAY's son-in-law get a city job. Similarly, DELIERE was charged with receiving an exam from CLEMENTE "in return for services and favors." CLEMENTE and Barbara Hickey testified that

DELIERE, after he became police chief, issued orders in 1980 and 1982 that helped Hickey obtain more bail bond business. This evidence means we cannot, on reviewing the record, conclude that the post–1981 salary payments took place after all other, joint activities had ceased, *i.e.*, after all special conspiracy-associated societal dangers had dissipated. For that reason, we believe that the cases the government cites control here. And, the district court properly denied the motions to dismiss the indictment and for judgment of acquittal.

■ R. CLEMENTE's conspiracy to obtain an advance copy of the 1979 sergeant's exam is different. The indictment charges, and the evidence shows, only that (1) CLEMENTE gave his brother a stolen exam, (2) R. CLEMENTE took the exam, (3) he consequently received a promotion to sergeant in 1979, and (4) he continued to receive a sergeant's salary after July 1981. The indictment says that salary payments were an object of the conspiracy. But it does not charge, nor does the evidence show, any further objectives or cooperative activity that continued into 1981. It does not, for example, charge that CLEMENTE gave his brother the exam in return for future services or favors. Unlike PINO's and DELIERE's cases, the record provides no evidence of conspiracy-associated dangers extending beyond July 1981 (though R. CLEMENTE entered into a *different*, separately charged conspiracy involving a lieutenant's exam in 1983). The record requires us to view the post-1981 receipt of salary as taking place well after, and isolated from, all other concerted activities, at a time when there was no further risk of conspiracy-associated dangers. Consequently, the receipt of salary is a "result" of, not an act in furtherance of, the conspiracy. There being no overt act within the relevant period, the statute of limitations bars R. CLEMENTE's prosecution in respect to Count 5 of the indictment.

### IV. *Other Conspiracy–Related Claims*

Appellants raise several additional claims in respect to the mail fraud conspiracy counts.

## A. *Joinder and Severance*

■ Appellants DOHERTY, PINO, DE-LIERE, and R. CLEMENTE argue that the government should not have tried them together. They say that it should have tried the general conspiracy count, involving DOHERTY, separately from the subsidiary "single exam" counts, involving PINO, DELIERE, and R. CLEMENTE.

The appellants, however, cannot successfully attack the trial court's initial decision permitting joinder of the counts. Fed.R. Crim.P. 8(b) permits the government to charge "two or more defendants ... in the same indictment ... if they are alleged to have participated ... in the same series of acts or transactions constituting an offense or offenses." Here, acts that were central to the subsidiary conspiracies, such as CLEMENTE's providing exams to PINO, R. CLEMENTE, and DELIERE, also formed part of the general conspiracy, and were also charged as overt acts in furtherance of the general conspiracy. Moreover, testimony about the MDPA's examination procedures, about mailings, and about how CLEMENTE obtained examinations was relevant to all the counts. By avoiding repetition of this testimony at several separate trials, trying the counts together saved time. A joint trial also allowed the jury to draw consistent conclusions about such common factual questions as CLEMENTE's objectives, and MDPA examination and mailing practices. Given the factual connections among the counts, and the practical advantages of a joint trial, Rule 8(b) clearly permits joinder. *See United States v. Arruda*, 715 F.2d 671, 678 (1st Cir.1983) (joinder is proper if there is sufficient overlapping of relevant facts or legal issues so that the practical benefits of consolidated trial outweigh each defendant's interest in having his guilt considered separately); *United States v. Barbosa*, 666 F.2d 704, 707–08 (1st Cir.1981) (Rule 8(b) joinder proper where seller of drugs was the same in both counts, though buyers in first sale were unconnected with buyers in second sale); *King v. United States*, 355 F.2d 700, 703–04 (1st Cir.1966) (cases with overlapping factual and legal issues are "classic examples" of benefits to the court that justify joinder).

■ Nor can any of the appellants successfully argue that the law required the district court to sever his trial from that of the others, under Rule 14. Rule 14 says a judge *"may ... grant a severance"* if "it appears that a defendant ... is prejudiced by joinder of offenses or of defendants" (emphasis added). The Rule uses the word "may," not "must," and thereby commits the determination primarily to the district court's discretion.

We cannot find so strong a showing of prejudice here as to bring this case outside the broad power the Rule grants to the district court. *See United States v. Porter*, 764 F.2d 1, 12 (1st Cir.1985) (denial of severance reversible only for abuse of discretion); *United States v. Drougas*, 748 F.2d 8, 18 (1st Cir.1984) (Rule 14 motion is addressed to discretion of trial judge, and its denial should not be reversed without a "strong showing of prejudice"). The district court went to considerable lengths to separate the evidence related to the different conspiracies. It required the government to present its evidence on the general conspiracy count first, and then to present evidence relating to each subsidiary conspiracy in turn. *See Doherty*, 675 F.Supp. at 738. The judge repeatedly instructed the jury about what evidence it should consider in respect to each count. Consequently, the record shows little potential for prejudice through the "spill-over effect" of evidence onto other counts or defendants, or through jury confusion. *See Porter*, 764 F.2d at 13 (limiting instructions are adequate safeguard against evidentiary spill-over); *Drougas*, 748 F.2d at 19 (rejecting spill-over claim because of judge's careful segregation of evidence and instructions on limited admissibility); *United States v. Smolar*, 557 F.2d 13, 21 (1st Cir.1977) (potential for prejudice in complicated conspiracy trial minimized where judge took "great pains" to give limiting instructions and explain the jury's duty to consider each defendant's guilt separately).

We also agree with the trial court, *U.S. v. Doherty*, 675 F.Supp. 714, 718–19 (D.Mass.

1987), that evidence of CLEMENTE's sales of examinations to other persons did not seriously prejudice PINO and DELIERE (even though they would have stipulated to those other sales, had the government tried them separately). These two appellants say this evidence was irrelevant to the charges against them, and that it would tempt the jury to infer that, since CLEMENTE sold exams to others, he also sold exams to them. However, this evidence showed CLEMENTE's prior bad acts, not their own. And, the trial court's segregation of evidence and limiting instructions reduced the risk that the jury would make improper inferences from these other sales. *See Porter*, 764 F.2d at 13 (speculative claims of prejudice do not meet the burden of showing abuse of discretion in denying severance).

DELIERE points out that, in the midst of trial, his codefendant DOHERTY said he would testify on DELIERE's behalf if there were separate trials; DELIERE argues that the trial court then should have severed his case. As we pointed out in *Drougas*, 748 F.2d at 19, once a defendant shows that a codefendant is willing to provide exculpatory testimony, but only in a separate trial, the trial court should (1) examine the significance of the testimony to the theory of defense; (2) consider whether the testimony would be subject to substantial, damaging impeachment; (3) assess the counterarguments of judicial economy; and (4) give weight to the timeliness of the motion.

Here, DELIERE did not ask the court for severance, to permit DOHERTY to testify, until the 52nd day of trial. DOHERTY's testimony was subject to serious impeachment. DOHERTY intended to testify only that CLEMENTE changed DELIERE's exam scores without DELIERE's knowledge or complicity. Application of the four *Drougas* factors indicates that the trial court need not have granted DELIERE the severance he sought.

Nor do we accept R. CLEMENTE's claim that the "conflicting defense theories" that led other defendants' counsel to discredit Barbara Hickey's and Joseph Bangs' testimony seriously prejudiced him. The "con-

flict" to which R. CLEMENTE points concerns only credibility of witnesses, not "defenses" that "are so inconsistent that the jury would have to believe one at the expense of the other." *Arruda*, 715 F.2d at 679.

Our review of the record reveals no prejudice through joinder so severe as to have required the district court to grant any of the appellants' motions for severance.

### B. *Variance*

SALERNO argues that the government proved a conspiracy significantly different from the general conspiracy that it charged in Count One, and that this variance was so prejudicial that he is entitled to a new trial. *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630–31, 79 L.Ed. 1314 (1935) (variance between charge and proof is harmless error unless it affects defendant's substantive rights); *see also United States v. Glenn*, 828 F.2d 855, 858 (1st Cir.1987). SALERNO says the government proved, at most that he obtained 15 to 20 exams from CLEMENTE and resold them to policemen seeking promotions. He says there was no evidence that he shared the other objectives of the general conspiracy, such as altering exam scores or placing friends in high places with an eye to future favors.

Even assuming, for the sake of argument, that SALERNO is right, that the evidence shows he participated only in a simpler, stripped-down version of the general conspiracy, this variance would not entitle him to a new trial. In *Glenn*, we said that a court, in considering variance claims, should ask three questions:

(1) Is the evidence sufficient to permit a jury to find the (express or tacit) agreement that the indictment charges? (2) If not, is it sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy? (3) If so, does the variance affect the defendant's substantial rights?

828 F.2d at 858. Here, even assuming that the answer to the first question is "no," and to the second question is "yes," the answer to the third question is "no." This

is not a case, like Glenn's, where the variance made an obvious difference. Glenn's conviction for the broad conspiracy charged allowed the government to establish a venue, and permitted the jury to convict him of substantive crimes done by his co-conspirators, neither of which would have been permissible had he only been charged with the smaller conspiracy actually proved at trial. *Id.,* 828 F.2d at 860. Instead, this case is like that of Glenn's codefendant, Benevides, where the variance was "harmless error" because no clear legal prejudice arose from the variance, and where the law would have permitted the sentence he received, for either the conspiracy charged or the smaller conspiracy proved. *Id.* at 861.

### C. *Mailings*

 Appellants DOHERTY, PINO, R. CLEMENTE, and SALERNO argue that the government failed to prove an essential element of mail fraud, that they "knowingly cause[d] [matter] to be delivered by mail," "for the purpose of executing" their "scheme ... to defraud." 18 U.S.C. § 1341. Our review of the record reveals that their claim is wrong. The government presented evidence of standard MDPA mailing practices, from which the jury could conclude that the MDPA mailed notices of promotion interviews to R. CLEMENTE, PINO, DOHERTY, and many other officers to whom the conspirators provided exams; that it would not have mailed these notices to these people, had the defendants not dishonestly bought or sold exams; and that receipt of these notices was a necessary step towards obtaining the promotions the defendants sought. The jury could also conclude that these appellants reasonably foresaw that the MDPA would use the mails in these or similar ways. *See United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974) (a defendant "causes the mails to be used," within the meaning of § 1341, when he acts with knowledge that a mailing will follow in the ordinary course of business, or where he can foresee a use of the mails). Though other MDPA mailings also took place, these suffice for purposes of the statute. *See United States v. Serino,* 835 F.2d 924,

928 (1st Cir.1987) (requirement of a mailing broadly construed in light of Congress' broad purpose to prevent use of mails "as part of activities to defraud"); *United States v. Silvano,* 812 F.2d 754, 760 (1st Cir.1987) (mailings need only be "closely related," not essential, to the scheme).

### V. *Evidentiary Claims*

Appellants make several claims in respect to the admission of evidence.

### A. *Suppression*

Appellant DOHERTY says the district court should have suppressed a piece of evidence, a copy of an April 1984 examination that the police found while they searched DOHERTY's barn, looking for evidence related to Gillen's shooting of Bangs. DOHERTY argued to the district court that the police seized this examination in violation of the Fourth Amendment. After holding a hearing, the district court concluded that the seizure of the exam was lawful, because the policy found it in "plain view" while, with a lawful search warrant, they searched DOHERTY's barn.

The evidence presented at the hearing indicates that, on the night of October 16, 1984, Gillen shot Bangs in DOHERTY's presence. The next day, the police obtained a warrant directing them to search DOHERTY's barn for (among other things) "blood, physiological fluids, hair, fibers, shotgun wadding, shotgun pellets, shotgun shells, a handgun and ammunition, a shotgun and ammunition, 'speedy dry.'" During the search, an officer named Fargo began to look through each book and document on a book shelf. He found a manila envelope, opened it and tipped it to see if anything would fall out. He spread the pages of a document he saw inside. While doing so, he recognized, from a "control number" on the corner of the document, that the document was a police promotional exam. He showed the exam to other officers and to an assistant district attorney. Several of the officers knew that DOHERTY was suspected of stealing exams. They also knew that, since 1975, MDPA rules had prohibited police officers from keeping

copies of old exams at home as study aids. The officers looked at the last page of the exam, which said the exam had to be turned in after it was given. They decided it was an actual exam, and they seized it.

We have recently said that a "plain view" seizure is lawful if (1) the seizing officer has a prior justification for being in a position to see the item in plain view; (2) the discovery of the item is inadvertent; and (3) the evidentiary value of the item is immediately apparent to the officer, so that the seizure is "grounded in probable cause." *United States v. Aguirre,* 839 F.2d 854, 858 (1st Cir.1988), quoting *United States v. Johnston,* 784 F.2d 416, 419 (1st Cir.1986). We review the district court's factual findings after a suppression hearing under a "clearly erroneous" standard, *see United States v. Regan,* 687 F.2d 531, 535 (1st Cir.1982). And, we conclude that the district court could properly find the *Aguirre* test satisfied.

■ The seizing officer had a legitimate justification for being where he was, namely, the search warrant. DOHERTY does not challenge the validity of the warrant. Given the nature of some items listed in the warrant, such as pellets, wadding, fibers, *etc.,* the district court might find that Fargo acted reasonably in looking inside the manila envelope and spreading the pages of the document inside. It was "reasonable to believe that the container could conceal items of the kind portrayed in the warrant." *United States v. Gray,* 814 F.2d 49, 51 (1st Cir.1987); *see also United States v. Ross,* 456 U.S. 798, 820–21, 102 S.Ct. 2157, 2170, 72 L.Ed.2d 572 (1982) (search extends to whole area where its object may be found, and is not limited by possibility that further acts of opening may be necessary to complete the search); *United States v. Crouch,* 648 F.2d 932, 933 (4th Cir.1981) (officers acted within scope of search for drugs and paraphernalia in removing letters from envelopes).

The district court could also reasonably conclude that Fargo inadvertently found the exam. And, although the question is a closer one, the court could find that the "contraband" or "evidentiary" nature of the exam was "immediately apparent." *Aguirre,,* 839 F.2d at 858. One might reasonably believe that any detailed reading of individual pages of the exam only *confirmed* the officers' prior suspicion, already grounded in probable cause, that the exam was stolen. They had personal experience with exams, they had suspicions about DOHERTY, and they knew that officers were not allowed to have exams at home. This case resembles *Aguirre,* in which we held that officers could seize keys to a Ford truck that were in plain view, *i.e.,* that the officers had probable cause to believe the keys were evidence of a crime, because (1) they found the keys in a suspected drug dealer's apartment, and (2) they knew that the suspects had used a Ford truck in a drug transaction that day. *Id.,* 839 F.2d at 856. This case significantly differs, in respect to how and when probable cause arose, from *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 1152–54, 94 L.Ed.2d 347 (1987) (officers could not seize stolen stereo in plain view during search of apartment, when their only reason to think it was stolen was that it was expensive and the apartment was "squalid," and they had to closely examine it to find its serial number, and check this number with headquarters, before they had probable cause to believe it was stolen).

### B. *Statistical Evidence*

R. CLEMENTE, citing cases dealing with statistical evidence, such as *United States v. Massey,* 594 F.2d 676 (8th Cir.1979) (expert witness' testimony on probability of matching hair samples inadmissible because "speculative and confusing"); *People v. Collins,* 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968) (prosecutor's calculation of probability that witness' description of defendants would match random persons inadmissible), argues that the court should not have admitted "statistical" evidence presented by Forbes McCann, the president of a consulting firm that wrote and graded some MDPA exams.

The short answer to CLEMENTE's argument is that McCann did not present any "statistical" evidence. He said, based on

personal knowledge, that four applicants taking the April 21, 1979 sergeant's exam received a score of 86 percent, that the exam contained 100 questions and that these four persons got the same 86 answers right and the same 14 answers wrong. Other evidence showed that R. CLEMENTE was one of these four persons; the other three were also persons whom the government claims had received advance copies the exam.

The cases R. CLEMENTE cites do not show that there is anything wrong with this evidence; they concern opinion testimony on probabilities, not factual testimony, based on personal knowledge, which happens to involve numbers.

### C. *Prejudice*

 DOHERTY argues that the district court should not have permitted BARNER'S counsel to cross-examine CLEMENTE about CLEMENTE and Bangs having lowered the exam scores of black applicants, on an occasion when they and DOHERTY had entered the MDPA offices. DOHERTY says this testimony prejudiced him, so its admission violated Fed.R.Evid. 403. The district court, however, could reasonably find the prejudice slight, given the fact that the evidence mainly discredited CLEMENTE and Bangs, not DOHERTY; CLEMENTE did not say DOHERTY participated in lowering the scores. The prejudice is considerably less than that in the case on which DOHERTY relies, *United States v. Barletta*, 652 F.2d 218 (1st Cir. 1981), in which this court ruled that a taped conversation between the defendant and an informant should have been excluded because it contained "ethnic slurs," "coarse language," and an "aura of nonspecific criminality." *Id.* at 220–21. The task of weighing relevance against prejudice belongs primarily to the district court, *United States v. Zeuli*, 725 F.2d 813, 817 (1st Cir. 1984) (applying abuse of discretion standard to Rule 403 question). We find no error.

### D. *Identification*

 DELIERE says the evidence against him was insufficient, because no one specifically identified him in court, *i.e.*, no one said that he, the man in the courtroom, was the same John Deliere whom the witnesses were talking about. There was, however, ample evidence to show that this is not a case of mistaken identity. The appellant has the same name, and the same nickname, "Jake," as the person indicted and about whom the witnesses spoke. The appellant stipulated that he received salary payments as Revere police chief, as did the John Deliere discussed by the witnesses. All the witnesses saw the appellant in court and heard him referred to as Deliere, and no one denied the identity. No one actually made an in-court identification, but we know of no legal requirement that identification must always take this form. *See United States v. Royals*, 777 F.2d 1089, 1091 (5th Cir.1985) (identity may be proved by circumstantial evidence); *United States v. Weed*, 689 F.2d 752, 755–56 (7th Cir.1982) (failure of witnesses to note that defendant was not the same John Weed they had met, and defendant's failure to object to prosecutor's identification to him, were sufficient evidence of identity).

## VI. *Crimes other than the Conspiracies*

Several defendants raise claims concerning convictions for crimes other than the mail fraud conspiracies.

### A. *RICO*

Appellant DOHERTY makes several arguments attacking his conviction for violating the "racketeering" statute, 18 U.S.C. § 1962(c), which makes it

> unlawful for any person ... associated with any enterprise ... the activities of which affect, interstate ... commerce, to ... participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity.

 1. DOHERTY says the government failed to prove the existence of an "enterprise." Section 1961(4) of the statute defines the word "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and

any union or group of individuals associated in fact although not a legal entity." The Supreme Court has specified that this definition encompasses associations that have only criminal functions. *See United States v. Turkette*, 452 U.S. 576, 581–82, 591, 101 S.Ct. 2524, 2528, 2532–33, 69 L.Ed. 2d 246 (1981) (§ 1961(4) encompasses two types of organizations, "legal entities" and associations in fact; also, RICO applies to an enterprise that "has no legitimate dimension"). The Court added that (1) proof of a "pattern of racketeering activity" and (2) proof that an enterprise exists, are distinct elements of the government's burden of proof: "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the activity in which it engages." *Id.*, 452 U.S. at 583, 101 S.Ct. at 2529. But, the Court also said that proof of the enterprise's acts of racketeering may overlap with proof of the existence of the enterprise itself. *Id.* (proof of these separate elements "may in particular cases coalesce").

In this case, the evidence was sufficient to show an ongoing association, not just a series of criminal acts. The government charged, and introduced evidence of, two entries of the MDPA's offices, ten efforts to obtain exams, thirteen instances of providing exams to applicants, as well as various acts of possessing exams, making answer sheets, changing scores, causing MDPA mailings concerning exams, and taking exams with illegal assistance. Each act involved either CLEMENTE or DOHERTY; each act tended to illustrate a single consistent method; and each act furthered a general scheme. The number of acts, their relationship, their having taken place over several years, and the consistent participation of the central figures in the scheme show a "group of persons associated together for a common purpose of engaging in a [criminal] course of conduct." *Id.*

2. DOHERTY argues that the government did not prove that the activities of the "enterprise" affected interstate commerce, as required by § 1962. We agree with DOHERTY that the govern-

ment showed only minimal effects on interstate commerce, but RICO requires no more than a slight effect upon interstate commerce. *See, e.g., United States v. Robinson*, 763 F.2d 778, 781 (6th Cir.1985) (RICO requires only a "minimal impact" on commerce, *e.g.*, that alcohol sold by defendants was made out of state); *United States v. Allen*, 656 F.2d 964 (4th Cir.1981) (supplies used in bookmaking operation originated out of state); *United States v. Altomare*, 625 F.2d 5, 7–8 (4th Cir.1980) (placement of interstate telephone calls is sufficient impact on commerce). Here, evidence that the appellants' activities may have prevented out-of-state applicants from obtaining jobs (seventy out-of-state applicants participated in one 1983 exam), thereby affecting the interstate labor market; that the MDPA replaced its locks with locks ordered from Philadelphia; and that an out of state consultant developed and graded some exams, is a stronger showing of effects on commerce than in *Allen* and *Altomare, supra,* and is sufficient to meet the statutory requirement.

DOHERTY goes on to say that the government failed to charge these effects in detail, for the indictment says only "the activities of the enterprise affected interstate commerce." But such general language is legally sufficient. *United States v. Deicidue*, 603 F.2d 535, 547–48 (5th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980) (conclusory allegation of effect on commerce sufficient in RICO indictment).

3. DOHERTY argues that the government failed to prove acts of mail fraud as the predicate acts of racketeering. His argument, as we noted at p. 60, *supra,* rests upon *McNally,* and we reject it for reasons set forth in Part II, *supra.*

### B. *Perjury*

Appellant BARNER makes several arguments attacking the lawfulness of his conviction under 18 U.S.C. § 1623 for lying under oath before a grand jury.

1. BARNER says his conviction is unlawful because his testimony was literally true. *Bronston v. United States*, 409

U.S. 352, 360–62, 93 S.Ct. 595, 601–02, 34 L.Ed.2d 568 (1973) (defendant cannot be convicted of perjury for literally true, but misleading and nonresponsive, answers).

Before the grand jury, the prosecutor asked BARNER about the September 8, 1979 captain's exam, and he answered as follows:

Q: Did you get a copy of that exam prior to taking the exam?

A: No, sir.

Q: Did you receive any unfair advantage?

A: No, sir.

This testimony appears to be false, for BARNER in fact did "get a copy" of the September 8 exam in advance, and did receive an "unfair advantage."

BARNER argues, however, that the words "that exam" in the first question might have referred to other exams he had taken on previous occasions, which he did not receive in advance. They also might have referred to the oral part of the September 8 exam (each exam had a written and an oral part), which he did not receive in advance. Thus, he says that his answers were not literally false.

The context in which the prosecutor asked the questions, however, makes them unambiguous:

Q: With regard to the captain's exam, what was your score on that, sir?

A: I ended up with a final score of 97. I got a hundred in the written exam, a 94 in the oral, and then those divided by ten [sic]. There was an experience factor figured in and then two points for being a veteran, with a final mark of 97.

Q: Did you miss any questions at all on the written exam?

A: Apparently not, no, sir.

Q: Did you prepare for that with a study group?

A: Yes, sir, I did.

Q: Who was in that study group?

A: The group mentioned earlier ...

Q: Did you get a copy of that exam prior to taking the exam?

A: No, sir.

Q: Did you receive any unfair advantage?

A: No, sir.

Since the questioner referred directly to the "captain's exam," and to the "written exam," only a few questions before the answers at issue, we see no significant ambiguity. The facts are very different from those in *Bronston,* where the questioner asked whether the defendant "now" had a Swiss bank account and whether his company had "ever" had a Swiss bank account, and the government based its charge of perjury on a claim that these two negative replies implied that the defendant himself had never had a Swiss bank account. *Id.* at 354–55, 93 S.Ct. at 598. The *Bronston* Court held only that a defendant cannot be convicted of perjury for true but misleading statements, not that a defendant is immune from prosecution for perjury whenever some ambiguity can be found by an implausibly strained reading of the questions he is asked.

■ 2. BARNER says the district court should have submitted to the jury the question whether BARNER's false statement to the grand jury was material. The district judge, however, did not expressly take this question away from the jury. He explained the requirement of materiality in his initial charge on the perjury count, though he did not mention it in the final charge. Assuming that the judge did take the issue away from the jury, this is not error. Materiality is an issue of law for the court to decide. *United States v. Glantz,* 847 F.2d 1, 11 (1st Cir.1988) (citing "well-settled rule" that materiality of perjury is issue of law).

■ 3. BARNER says the district court should have granted his motion to join a perjury indictment in another case with the indictment in his case, so he would be tried on both charges at the same time. The other case involved perjury on the same day before the same grand jury. The other perjured statements were not about stealing exams, however, but about CLEMENTE's allowing Richard Nagle to copy CLEMENTE's answers while both were taking a promotional exam in 1976.

The two incidents BARNER described took place several years apart, the prior scheme involved a different method of cheating and predated CLEMENTE's access to the MDPA offices, the participants were different, and, of course, the particular questions that BARNER answered before the grand jury were different. Hence, the two perjury charges are distinct enough so that they were properly charged in two separate counts. *See United States v. Scott*, 682 F.2d 695, 698 (8th Cir.1982) (separate false statements which required different proofs of falsity may properly be charged in separate counts, even though they are all related and arise out of the same transaction); *United States v. De La Torre*, 634 F.2d 792, 794–95 (5th Cir.1981) (perjury relating to separate aspects of the criminal activity, as to which different evidence was required to establish falsity, properly charged in four separate counts). Since the two false statements are distinct crimes, there is no question of double jeopardy in violation of the Fifth Amendment.

The district court did not abuse its discretion in refusing to join the other perjury charge with this case, a joinder that would have increased the complexity of this already complex trial. *See* Fed.R.Crim.P. 13 ("the court *may* order two or more indictments ... to be tried together" (emphasis added)); *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 635 (2d Cir.), *cert. denied*, 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946) (question of consolidation is within discretion of district court, and decision reversible only for abuse of discretion).

### VII. *Other Issues*

#### A. *Prosecutorial Misconduct*

■ 1. CLEMENTE and DOHERTY argue that they should have a new trial because the prosecutor knowingly presented perjured testimony. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (prosecutor may not knowingly use false testimony to obtain a conviction, even if the false testimony goes only to the credibility of a witness). Their claim concerns testimony about lowering the scores of black applicants. CLEMENTE testified that Bangs urged him to lower the scores of black applicants, and that he did so when inside the MDPA offices with DOHERTY. Bangs, another prosecution witness, denied any part in this incident.

After reading the record, we can find no more than a conflict of testimony among witnesses. Neither *Napue* nor any other decision prohibits a prosecutor from calling witnesses who will present conflicting stories. In fact, the prosecutor did not even elicit any of this testimony; BARNER's counsel elicited the story from CLEMENTE, and DOHERTY's counsel elicited the denial from Bangs. The record provides no reason to believe that the prosecutor knew that one or another of the witnesses was lying. *See United States v. McGovern*, 499 F.2d 1140, 1143 (1st Cir. 1974) (*Napue* does not forbid calling witnesses whose reliability is suspect, but only obligates the government to disclose any evidence which contradicts such witnesses or undermines their credibility). Moreover, the appellants fail to show that they were prejudiced by this testimony. *See United States v. Kattar*, 840 F.2d 118, 128 (1st Cir.1988) (government's presentation of false testimony is not prejudicial error, absent a reasonable likelihood that it affected the verdict).

■ 2. R. CLEMENTE says the prosecutor argued improperly when, in his rebuttal argument, he referred to the defendants as friends:

> "Thomas Doherty, a friend of [G.] Clemente's for years,.... A man who was a good friend of Clemente's for years and years.
>
> \* \* \* \* \* \*
>
> "Barner was [CLEMENTE's] friend.
>
> \* \* \* \* \* \*

The only way to get at the crime is to use the witnesses that were generated at the time, the friends of those defendants. We do not see, however, just how this argument was improper. Evidence in the record supported the conclusion that DO-HERTY and BARNER were friends of

CLEMENTE. Moreover, the court immediately told the jury that statements made in argument are not evidence. The statement does not sound like an improper expression of the prosecutor's "personal opinion" about the defendants' guilt. *See Ferreira v. Fair*, 732 F.2d 245, 249 (1st Cir.1984). Moreover, we do not see how statements about CLEMENTE, DOHERTY, and BARNER could have unfairly prejudiced Robert CLEMENTE. *See id.* (touchstone of due process is fairness of trial, not culpability of prosecutor).

### B. *Excusing a Juror*

Appellants BARNER, PINO and DELIERE argue for a new trial on the ground that the judge, while the jury was deliberating, communicated with a juror *ex parte* and decided to excuse him. The facts are as follows:

About midnight on Saturday, May 2, 1987, after 54 days of trial and three days of jury deliberations, a United States Marshal telephoned the district judge at his home. The Marshal told the judge that one of the jurors was upset and threatened to walk out of the hotel where the jury was sequestered. The judge spoke to the juror on the phone. The juror told him that his former wife had died of cancer, leaving him with two small children. His children were upset at being left in the care of his second wife during his long absence. The juror had spoken to them that evening, and found his wife "hysterical" and his son crying. He felt, as a result of this conversation, that if he could not go home immediately to reconcile himself with his family, "there would be nothing for him when he went home." The judge then excused the juror.

In ruling on defendants' motion for a mistrial, the judge explained his decision as follows:

At the time, his emotional state and the risk that he might feel impelled to act contrary to the Marshal's appropriate directions ... seemed to mandate prompt action, especially in view of the effect I feared a physical altercation between a

juror and the Marshals might have upon the remaining deliberating jurors.

*Doherty*, 675 F.Supp. at 741.

None of the appellants disputes these facts. Under the circumstances, it seems to us that the judge showed considerable common sense, and that the decision to excuse the juror was clearly within his discretion. *See United States v. Molinares Charris*, 822 F.2d 1213, 1223 (1st Cir.1987) (appellate court should not second-guess trial judge, who is in best position to assess whether a juror is unable to fulfill his duties; excusing a nervous, upset juror who had taken a tranquilizer was not abuse of discretion).

Appellants' strongest objection, however, is not to the decision itself. They say the judge should have found some temporary solution, held a hearing with all counsel present, and only then decided whether to excuse the juror. Indeed, the judge himself later said his decision to act unilaterally was an error, *see Doherty*, 675 F.Supp. at 741. In our view, however, the procedure that the district judge followed does not require a retrial, because it did not substantially prejudice the appellants. It did not in any way deprive them of a fair trial. Appellants point out that the reported case law indicates that district judges have always held hearings prior to deciding whether to excuse a juror. *See, e.g., Molinares Charris*, 822 F.2d at 1223 (judge met with counsel to discuss alternatives before excusing juror); *United States v. Guevara*, 823 F.2d 446, 447 (11th Cir.1987) (judge had "extended discussions" with counsel on what to do when juror became ill). Yet, this case involved a sudden crisis, arising in the middle of the night when locating all counsel and convening the court would have been difficult. The trial judge was acting within the limits of his discretionary powers in excusing the juror. The appellants have proposed no alternative course of action that the court would likely have adopted, had it been suggested at a prior hearing. That being so, we conclude that the decision not to hold a hearing was reasonable in the circumstances and did not deprive appellants of a fair trial. *See Moli-*

*nares Charris,* 822 F.2d at 1223 (trial court properly excused juror even though defense counsel urged him to continue the case and see if juror's condition improved).

■ Appellants also complain of the fact that the judge communicated *ex parte* with the juror. We have held that such *ex parte* communication raises a "presumption" of prejudice, but it is also subject to the harmless error rule. *United States v. Flaherty,* 668 F.2d 566, 602 (1st Cir.1981). Here, the very circumstances of the communication rebut the presumption. The judge's conversation could not have influenced the excused juror's further deliberations, for there were none; nor could it have influenced the remaining eleven jurors, because the excused juror had no further contact with them. The record thus demonstrates that the communication was harmless.

### C. *Sentencing*

Two appellants make arguments challenging the lawfulness of their sentences.

■ 1. CLEMENTE argues that the government promised, in a plea agreement, to recommend a concurrent sentence at his sentencing hearing, but it failed to do so. We agree with CLEMENTE that the government promised to make this recommendation, and that the government must keep its promises made in plea agreements. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971) (when a guilty plea rests on any promise or agreement, the agreement "must be fulfilled" or the plea is invalid). But we do not agree that it broke the promise.

The record reveals that the prosecutor recommended to the district court, on October 14, 1986, when CLEMENTE changed his plea to guilty on the RICO charge, that the court sentence him concurrently with a state court sentence for burglary. The presentence report also contained this recommendation. A district court typically reads a presentence report just before sentencing. The record indicates that the court was fully aware of the government's recommendation at the time of the sentencing hearing; the court said it had considered "the recommendation of the United States Attorney." But, it added that it declined to follow that recommendation.

CLEMENTE points out that the United States attorney failed to repeat the recommendation orally on June 19, 1987, at the sentencing hearing. This is so, but the failure seems inadvertent, and it also seems harmless. CLEMENTE's counsel concedes that he did not notice the omission. He did not object or ask the United States Attorney to call the matter to the court's attention. The court was fully aware of the recommendation. The plea agreement does not specifically say that the government must reiterate the recommendation orally at the time of sentencing. Thus, we can find no breach of the agreement, either in its letter or its spirit, as a result of the prosecutor's inadvertent and harmless failure to repeat the recommendation.

■ 2. SALERNO argues that the court, in sentencing him, made an example of him because of his job as a state legislative aide, which, the judge thought, gave him "insider" status. He says this constitutes an unlawful failure to "individualize" his sentence. *See United States v. Jimenez Rivera,* 842 F.2d 545, 548 (1st Cir.1988) (sentence within lawful limits can be overturned only in exceptional cases, where trial court adopted rigid, mechanistic approach to sentencing and failed to consider individual mitigating factors). We disagree.

We have said that a trial court cannot "relentlessly pursue at a defendant's cost a single, questionable theory while simply brushing aside all the other criteria commonly weighed" in sentencing. *United States v. Wardlaw,* 576 F.2d 932, 939 (1st Cir.1978). But there is no indication here that the trial judge failed to consider SALERNO's individual culpability. The judge gave each defendant convicted on Count One a different sentence, and he explained the differences with respect to individual factors. SALERNO's long tenure in a position of trust in state government *is* an individual factor that, arguably, makes his

conduct more culpable. As in *Jimenez Rivera*, the appellant's "true complaint is not that the court failed to exercise its discretion. [His] real complaint is that in exercising its discretion, the court chose to emphasize factors which [he] dislike[s]." *Id.*, 842 F.2d at 549. The sentence was proper.

We find all other arguments that appellants have made, and all variations on the arguments we have discussed, to be without merit.

The conviction of R. CLEMENTE on Count 5 is *Reversed.*

All other convictions are *Affirmed.*

### APPENDIX A

*Relevant Charges—Listed By Crime*

1. The general mail fraud conspiracy (Count One)
 a. Convicted by jury:
 DOHERTY
 BARNER (granted new trial by district court)
 SALERNO
 b. Unindicted co-conspirator:
 CLEMENTE

2. The subsidiary conspiracies:
 a. Convicted by jury:
 PINO (Count 3)
 R. CLEMENTE (Counts 5 and 7)
 DELIERE (Count 6)
 b. Pled guilty:
 RAY (Count 3)

3. RICO charges:
 a. Convicted by jury: DOHERTTY
 b. Pled guilty: CLEMENTE

4. Perjury
 a. Convicted by jury: BARNER
 b. Pled guilty: RAY

APPENDIX B
Convictions—Listed by Defendant

| Defendant | Conviction | Count |
|---|---|---|
| CLEMENTE (pled guilty) | RICO | 11 |
| DOHERTY | general conspiracy | 1 |
| | RICO | 11 |
| SALERNO | general conspiracy | 1 |
| BARNER | general conspiracy (given new trial) | 1 |
| | perjury | 2 |
| PINO | subsidiary conspiracy | 3 |

| Defendant | Conviction | Count |
|---|---|---|
| RAY (pled guilty) | subsidiary conspiracy | 3 |
| | perjury | 4 |
| R. CLEMENTE | subsidiary conspiracies | 5, 7 |
| DELIERE | subsidiary conspiracy | 6 |