UNITED STATES of America,
Plaintiff–Appellee,

v.

Darryl Pernell CAMPS, Defendant–
Appellant.

No. 93–5191.

United States Court of Appeals,
Fourth Circuit.

Argued April 13, 1994.

Decided Aug. 11, 1994.

ARGUED: Joseph Franklin Lyles, Charlotte, NC, for appellant. Robert James Conrad, Jr., Asst. U.S. Atty., Charlotte, NC, for appellee. ON BRIEF: Jerry W. Miller, U.S. Atty., Charlotte, NC, for appellee.

Before WIDENER and LUTTIG, Circuit Judges, and TURK, United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge WIDENER and Judge TURK joined.

## OPINION

LUTTIG, Circuit Judge:

A jury convicted Darryl Pernell Camps of conspiring to possess with intent to distribute and to distribute cocaine base, in violation of 21 U.S.C. § 846; of using fire and an explosive in committing a felony, in violation of 18 U.S.C. § 844(h)(2); and of eight counts of using or carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). The district court sentenced Camps to life imprisonment for the conspiracy conviction, a five year consecutive sentence for the section 844(h)(2) violation, and a forty-five year consecutive sentence on the section 924(c)(1) counts. We affirm.

### I.

On June 7, 1990, Camps, along with nine codefendants, was indicted and charged with participating in a conspiracy headed by a druglord named Cecil Jackson. According to the government, the goal of Jackson's conspiracy was the distribution of cocaine and crack in Charlotte, North Carolina. The conspirators allegedly wore black "Raiders" clothing to symbolize their "mean attitude;" referred to themselves as "357," which signified a one-man superiority over the 356 on-duty officers of the Charlotte Police Department; and were heavily armed with Uzis, AK–47s, and other semiautomatic weapons. Seven of Camps' codefendants stood trial in October 1990; six of them were convicted, and their convictions and sentences were upheld on appeal by this court. *See United States v. Jackson,* 953 F.2d 640 (4th Cir.) (unpublished), *cert. denied,* —— U.S. ——, 112 S.Ct. 2981, 119 L.Ed.2d 598 (1992). During his codefendants' trial, Camps remained at large. In January 1992, however, he was finally apprehended, and in February 1992, the government obtained a superseding indictment that charged Camps as the one remaining defendant.

The government claimed that in addition to distributing crack in Charlotte, the Jackson group became involved in a war with a gang of rival drug dealers led by Wyatt Brown. The war allegedly began in late 1989 after Jackson gave Brown approximately $10,000 to purchase crack in New York and Brown shorted Jackson on the crack.

The first casualty of the war was one of Jackson's dealers, Antonio Cunningham, whom Brown shot in the foot. Shortly afterward, Jackson called a meeting at which it was decided that Brown should be killed.

On December 23, 1989, Jackson, who had just purchased an AK–47 from a gun dealer, assembled his group in the Barrington Oaks subdivision in Charlotte. Armed with a variety of weapons, they waited for Brown to arrive. A truck in which the group thought Brown was riding drove up, and the group opened fire. As it turned out, Brown was not in the truck. However, one of Brown's dealers, "Detroit Red," who was driving the truck, was wounded.

On December 27, the Jackson group located a BMW automobile operated by Brown. Cunningham, Camps, and several other co-conspirators drove to a gas station and filled a Coca–Cola bottle with gasoline. Upon returning to Brown's car, a member of the group named Darrin Roseboro opened the trunk, Cunningham poured in the gas, and Camps threw in a lighted match. The BMW burst into flames.

On January 6, 1990, the Jackson group held a meeting at the Innkeeper Motel in Charlotte, in a room rented by Camps. At the time, the group was traveling in a van rented by Camps' cousin and paid for by Camps. The meeting was called because of concerns that Camps' girlfriend, "Baby Doll," who also dated Brown, was providing Brown with information about the Jackson organization. After the meeting, and just after midnight on January 7, the group found Baby Doll and forced her to telephone Brown and ask him to pick her up. While Camps and several other members of the group waited armed in the van, two members of the group, Brian Mack and Gary Davis, armed themselves with an AK–47 and an Uzi. When an automobile carrying three of Brown's men

arrived, Mack and Davis opened fire. Mack's weapon was equipped with a banana clip, and he fired all sixty rounds. After the ambush, the group, Camps included, returned to the Innkeeper Motel.

On January 8, the Jackson group, still traveling in the van Camps had rented, stopped at the Red Roof Inn, also in Charlotte. A maid at the motel saw a rifle being passed in the van and told the front desk.

Alerted, the group drove out of the motel, but they were eventually stopped by the police. Camps, alone of the group members, produced false identification and gave the fictitious name of Cornelius Wells. At the stop, the police seized five semiautomatic weapons from the van.

At Camps' trial, the government's principal witnesses were Cunningham and Roseboro, both of whom had been convicted of participating in the Jackson conspiracy in October 1990. The government also relied on the testimony of Mack and Derrick Gomillion, who had pleaded guilty to that charge rather than stand trial. Camps took the stand in his defense and claimed that he had been taken hostage by the Jackson group during the war with Brown as insurance against the possibility of "Baby Doll" going to the police.

## II.

### A.

■ Camps levels two attacks against his conspiracy conviction. He first claims that the government's evidence did not demonstrate that he participated in Jackson's conspiracy, but rather showed that he had his own, separate conspiracy with Roseboro and Cunningham, the goal of which was also the distribution of crack in Charlotte. In asserting this claim, Camps relies principally on a statement by Mack that "he [Camps] got his stuff on his own and he sold it on his own," J.A. at 376, which, he contends, demonstrates that he had no connection whatsoever with the Jackson group.

■ We find no merit to this argument. The question of whether a single conspiracy exists is one " 'singularly well-suited to resolution by the jury.' " *United States v. Leav-*

*is,* 853 F.2d 215, 218 (4th Cir.1988) (quoting *United States v. McGrath,* 613 F.2d 361, 367 (2nd Cir.1979)). If the jury is properly instructed with regard to single versus multiple conspiracies, the finding of a single conspiracy must stand, unless the evidence, taken in a light most favorable to the government, would not have allowed a reasonable jury to have so found. *See United States v. Urbanik,* 801 F.2d 692, 695 (4th Cir.1986).

There is no question in this case that the jury was properly instructed. The district court told the jury that "[i]n order to sustain its burden of proof for [the conspiracy] charge, the Government must show that the single conspiracy alleged in Count One of the indictment existed. And proof of separate or independent conspiracies is not sufficient." J.A. at 582. It then continued, "[e]ven if the evidence in the case shows that the defendant, Camps, was a member of some conspiracy, but if this conspiracy is not a single conspiracy charged in the indictment, you must acquit the defendant." *Id.* at 583.

Taking the evidence in the light most favorable to the government, *see Urbanik,* 801 F.2d at 695, a reasonable jury could easily have found that Camps participated in Jackson's conspiracy. First, there was credible testimony by government witnesses that Camps knowingly participated in joint drug purchases with Jackson. Derrick Gomillion testified that he, Jackson, and Camps went to the Catawba House, a building used by Dominican drug dealers to sell crack, on two occasions. J.A. at 252–53. The second time, several other coconspirators were present. They all gave their money to Camps; Camps then went into the house, purchased the crack, and distributed it among the group. *Id.* at 253. Gomillion's testimony in this regard was corroborated by Roseboro. *Id.* at 178–79. Gomillion also testified that on another occasion when Jackson needed drugs, Jackson called Camps and they went together to a Jamaican supplier named "Stud." *Id.* at 255. Jackson gave Camps the money, and Camps brought the cocaine back. *Id.* at 256. There was also evidence that Camps knew the secret beeper code that allowed Jackson to contact members of the group. *Id.* at 259–60.

Camps was also an active participant in the war with Brown. Cunningham testified that Camps was present at all of the group meetings called by Jackson at which the group agreed that it was necessary to protect themselves against Brown, and that Camps kept weapons that Jackson supplied for this purpose. *Id.* at 108–10. Cunningham's testimony was corroborated by Brian Mack. *Id.* at 318. Moreover, there was a great deal of government evidence that Camps was present and armed on the occasions when the group attempted to ambush Brown. *Id.* at 112, 333. All in all, therefore, Camps' involvement in the Jackson conspiracy was clearly proven.

#### B.

In the alternative, Camps argues that there was a "fatal variance" between the indictment and the government's proof at trial that requires that he be retried on the conspiracy charge. He contends that the jury could have believed that there were two separate conspiracies, but nonetheless could have convicted him of participating in Jackson's conspiracy based on the district court's instruction on *Pinkerton* liability. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). In particular, Camps claims that because Cunningham and Roseboro participated in the war against Brown, and because there was evidence of the separate drug distribution conspiracy involving Cunningham, Roseboro, and himself, the jury could have imputed the actions of Roseboro and Cunningham in the war to him, even if, as Camps claimed at trial, he did not participate in it.

■ This argument too must be rejected. For there to be a "fatal variance" between pleading and proof, the government must first have proved a separate conspiracy from the one charged in the indictment. *See United States v. Barsanti,* 943 F.2d 428, 439 (4th Cir.1991), *cert. denied sub nom. Griffey v. United States,* — U.S. —, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). As just discussed, the government's case that Camps

participated in the single conspiracy charged in the indictment was strong. Thus, we are hesitant to conclude that there was a variance at all; *a fortiori,* we do not believe that any variance could have prejudiced Camps' substantial rights, as would be necessary for this court to order a retrial. *See Kotteakos v. United States,* 328 U.S. 750, 756–57, 66 S.Ct. 1239, 1243–44, 90 L.Ed. 1557 (1946); *Barsanti,* 943 F.2d at 439. Camps' conviction on the conspiracy charge is therefore affirmed.[1]

#### III.

#### A.

Camps was also convicted of eight violations of 18 U.S.C. § 924(c)(1) and sentenced to forty-five years imprisonment to be served consecutively to the life sentence imposed on the conspiracy charge. The first section 924(c)(1) violation related to the December 1989, shooting of Detroit Red; the next two were based on the January 7, 1990, ambush of Brown's henchmen with the AK–47 and the Uzi; and the next five arose out of the January 8, 1990, van stop, at which the Charlotte police seized five semi-automatic weapons. Camps was sentenced to five years imprisonment on the first conviction; to twenty years consecutive for the second and third convictions; and to twenty years consecutive for the fourth through the eighth convictions. Thus, he received one sentence for the December 1989, use, one sentence for the January 7, 1990, use, and one sentence for the January 8, 1990, use.

■ Camps seeks the reversal of his section 924(c)(1) convictions on the grounds that the government did not prove, as was necessary, that the firearms were used or carried "during and in relation to" a drug trafficking crime. Specifically, Camps argues that the war with Brown had nothing to do with the Jackson group's crack distribution conspiracy, and therefore that the guns used in that war were not used during or in relation to a

---

1. We also reject Camps' arguments attacking his life sentence on the conspiracy charge, namely that the district court erred in not making adequate findings on the amount of drugs reasonably foreseeable to him and that those findings were clearly erroneous.

drug trafficking offense.[2] We have little difficulty disposing of this argument.

In the prior appeal by Camps' co-conspirators, which involved the same facts as this case, we held that a reasonable jury could easily have concluded that the firearms were used or carried "during and in relation to" the Jackson drug conspiracy, *see United States v. Jackson*, 953 F.2d 640 (4th Cir.) (unpublished), *cert. denied*, —— U.S. ——, 112 S.Ct. 2981, 119 L.Ed.2d 598 (1992), and we have no reason to retreat from that conclusion here. All of the charged section 924(c)(1) violations occurred while the conspiracy was ongoing and as its members were attempting to defend themselves against, and thus preserve their drug operation from, violence at the hands of their rival operator Brown. As such, there was more than sufficient evidence for a reasonable jury to conclude that the firearms were used "during and in relation to" a drug trafficking crime. *See Smith v. United States*, —— U.S. ——, ——, 113 S.Ct. 2050, 2059, 124 L.Ed.2d 138 (1993) (holding that the firearm "must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence").[3]

### B.

■ Camps next challenges the forty-five year sentence imposed on his section 924(c)(1) convictions. He asks us to adopt the view, espoused to a greater or lesser extent by the Second, Fifth, Sixth, Ninth, Tenth and Eleventh circuits, that multiple consecutive sentences cannot be imposed for multiple section 924(c)(1) convictions if those convictions arise out of the events of a single predicate offense—in Camps' case, the drug conspiracy. In response, the government asks us to hold, as has the Eighth Circuit, that multiple, consecutive sentences under section 924(c)(1) are appropriate whenever there have been multiple, separate acts of firearm use or carriage, even when all of those acts relate to a single predicate offense. We find the government's interpretation of section 924(c)(1) more persuasive.[4] Because Camps is essentially arguing that he cannot be punished more than once for having committed only one offense, his claim sounds in Double Jeopardy. In *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983), the Supreme Court held that "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Accord, Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981) ("Where Congress intended ... to impose multiple punishments, imposition of such sentences does not violate the Constitution.").

■ The most persuasive source of congressional intent is, of course, the statutory text. In relevant part, 18 U.S.C.§ 924(c)(1) provides:

> *Whoever, during and in relation to any crime of violence or drug trafficking crime* (including a crime of violence or drug trafficking crime which provides for enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, *uses or carries a fire-*

---

**2.** *See* 18 U.S.C.A. § 924(c)(1) (West Supp.1994) ("Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years.... In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years....").

**3.** There is some uncertainty in Camps' brief as to whether he means to challenge his conviction under 18 U.S.C. § 844(h) for using fire to commit a felony on similar grounds. Although

Camps does not make an argument on this point, he does list the section 844(h) conviction as among those that should be reversed. Assuming that Camps does intend to challenge his section 844(h) conviction as well, we reject his claim, because section 844(h) does not include the "during and in relation to" language that appears in 18 U.S.C. § 924(c)(1).

**4.** Because Camps did not object to his sentence on this ground in the district court, plain error review is mandated. As we hold below, the district court did not err in sentencing Camps; *a fortiori*, it did not commit "plain" error.

*arm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years* .... In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years, .... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried.

18 U.S.C.A. § 924(c)(1) (West Supp.1994) (emphasis added).

The plain language of section 924(c)(1) criminalizes "us[ing] or carr[ying] a firearm" during any violent or drug trafficking crime, *id.*, and it is "us[ing] or carr[ying] a firearm" during any such crime that gives rise to "a violation of th[e] subsection." *Id.*[5] It is, we believe, self-evident that a defendant who has engaged in numerous instances of the precise conduct that Congress has outlawed has committed more than one criminal offense. A defendant who has "used" or "carried" a firearm on several separate occasions during the course of a single continuing offense, therefore, has committed several section 924(c)(1) offenses. *See United States v. Lucas,* 932 F.2d 1210, 1221–23 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 199, 116 L.Ed.2d 159 (1991); *see also United States v. Mabry,* 3 F.3d 244, 250 (8th Cir.1993), *cert. denied sub nom. Edwards v. United States,* —— U.S. ——, 114 S.Ct. 1403, 128 L.Ed.2d 75

(1994); *United States v. Canterbury,* 2 F.3d 305, 306 (8th Cir.1993) (opinion by Arnold, C.J.); *United States v. Edwards,* 994 F.2d 417, 423–24 (8th Cir.), *cert. denied sub nom. McGee v. United States,* —— U.S. ——, 114 S.Ct. 701, 126 L.Ed.2d 667 (1994).[6] The text of section 924(c)(1) is also clear that multiple consecutive sentences are appropriate in the case of multiple section 924(c)(1) offenses, *see* 18 U.S.C.A. § 924(c)(1) (West Supp.1994) ("In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years, .... [T]he term of imprisonment imposed under this subsection [shall not] run concurrently with any other term of imprisonment....").

This interpretation of section 924(c)(1) is supported by the Supreme Court's seminal decision in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). In *Blockburger,* one of the defendant's claims was that he should not have been convicted twice and given consecutive sentences under the Harrison Narcotics Act, because in selling morphine hydrochloride to the same person on two different days, he had merely committed a single continuing offense. The Court rejected this argument and stated that the first sale had been consummated before the second was initiated, and thus that the sales "were distinct and separate sales made at different times." *Id.* at 301, 52 S.Ct. at 181. It noted that the Harrison Act "d[id] not create the offense of engaging in the business of selling ... drugs," but rather penalized "any sale made in the absence of ... [its] qualifying requirements." *Id.* at 302, 52 S.Ct. at 181. The Court then quoted Wharton's Criminal Law: " 'The test is

---

5. *See also* S.Rep. No. 98–225, 98th Cong., 2d Sess. 312, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3490 ("Part D of Title X is designed to impose a mandatory penalty without the possibility of probation or parole, for any person who *uses* or *carries* a firearm during and in relation to a Federal crime of violence ....") (emphasis added).

6. The sparse legislative history that surrounds section 924(c)(1)'s enactment is not especially enlightening as to Congress' intent on the specific question before us. For example, the sponsor of the amendment to the Omnibus Crime Control and Safe Streets Act of 1968 that is embodied in

section 924(c)(1), Representative Poff, stated when introducing the amendment that its purpose was:

[T]o persuade the man who is tempted to commit a federal Felony to leave his gun at home. Any such person should understand that if he uses his gun and is caught and convicted, he is going to jail. He should further understand that if he does so a second time, he is going to jail for a longer time.

114 Cong. Rec. 22231 (1968). This comment, frankly, could be read to support either of the conflicting interpretations adopted by the various circuit courts.

whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately.'" *Id.* (quoting Wharton's Criminal Law, 11th ed., § 34). Because the "individual acts"—*i.e.* the sales—were prohibited, each successive sale constituted a distinct offense and was separately punishable. Just as the Harrison Act proscribed each separate drug sale, and not the business of selling drugs, so too section 924(c)(1) prohibits each separate act of firearm use or carriage, not violent crimes and drug trafficking with firearms. Each separate act of firearm use or carriage, therefore, is separately, and consecutively, punishable.

We are also satisfied that this interpretation best achieves section 924(c)(1)'s unmistakable objective of "persuad[ing] the man who is tempted to commit a federal Felony to leave his gun at home," 114 Cong. Rec. 22231 (1968) (*quoted in Busic v. United States*, 446 U.S. 398, 414, 100 S.Ct. 1747, 1757, 64 L.Ed.2d 381 (1980)). If multiple uses of extraordinarily dangerous weapons like the AK–47s and Uzis at issue in this case could not be punished with multiple consecutive sentences, there would be little deterrence against armed drug dealers using those weapons repeatedly during a lengthy drug conspiracy. On the facts of this case, for example, accepting Camps' argument would allow him to escape punishment completely for the January 7 ambush, in which more than 60 rounds of ammunition were rapid-fired from two semiautomatic weapons, endangering the lives not only of Brown's henchmen who were the intended targets of this mindless violence, but of innocent bystanders as well. We have little doubt that this is not the result that Congress contemplated when it enacted section 924(c)(1).

The best reasoned of the circuit court opinions supporting Camps' position have been based on one of two major premises: either that Congress unequivocally intended section 924(c)(1)'s unit of prosecution to be the predicate offense, *see United States v. Taylor*, 13 F.3d 986, 993–94 (6th Cir.1994) ("The purpose of § 924(c)(1) ... is to target those defendants who choose to involve weapons in an underlying narcotics crime or crime of violence. Consequently, the predicate offense, not the firearm, is the object of § 924(c)(1)."), or that section 924(c)(1) is ambiguous in this regard, and that therefore the predicate offense should be chosen as the statute's unit of prosecution on lenity grounds. *See United States v. Lindsay*, 985 F.2d 666, 674–75 (2nd Cir.1993) ("When viewed as a whole, this firearms statute, like the obstruction statute in *[United States v.] Coiro* [922 F.2d 1008 (2nd Cir.1991)], is ambiguous as to the appropriate unit of prosecution.").[7] Under these interpretations, where the government has charged a defendant with having committed only one underlying offense, that defendant may not be convicted more than once under section 924(c)(1) no matter how many times he used or carried a firearm. *See id.* at 676; *Taylor*, 13 F.3d at 993–94. And because section 924(c)(1) states clearly that a second, consecutive sentence is appropriate only "[i]n the event of a second or subsequent conviction under this subsection," multiple punishments for that defendant under section 924(c)(1) have not been authorized by Congress. *See Lindsay*, 985 F.2d at 676; *Taylor*, 13 F.3d at 994.

The fatal flaw with these interpretations is that the plain language of section 924(c)(1) very clearly does *not* criminalize the underlying predicate offense, whether it be a crime of violence or a drug trafficking crime. Section 924(c)(1), rather, proscribes, as a separate and distinct offense, the use or carry of a firearm during the commission of or in relation to these predicate offenses. *See Simpson v. United States*, 435 U.S. 6, 10, 98 S.Ct. 909, 911–12, 55 L.Ed.2d 70 (1978) (section 924(c) creates an offense distinct from the underlying federal felony). Predicate offenses, which the Second and Sixth Circuits have proffered as acceptable unit of prosecu-

**7.** Other cases advancing this view are primarily based on citations of prior circuit court decisions and *ipse dixits. See, e.g., United States v. Hamilton*, 953 F.2d 1344, 1345–46 (11th Cir.1992), *cert. denied sub nom. Adams v. United States*, — U.S. —, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992); *United States v. Privette*, 947 F.2d 1259, 1262 (5th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1279, 117 L.Ed.2d 505 (1992); *United States v. Smith*, 924 F.2d 889, 894–95 (9th Cir.1991); *United States v. Henry*, 878 F.2d 937, 942–43 (6th Cir.1989).

tion alternatives, are already proscribed by other federal statutes. To base a statute's unit of prosecution on an offense that the statute does not prohibit is illogical; we would not say, for example, that a provision imposing increased penalties for "committing murder, rape, or larceny during and in relation to a drug trafficking crime" could not be violated more than once during a lengthy drug conspiracy. Thus, the Sixth Circuit's view that section 924(c)(1)'s unit of prosecution is unequivocally the underlying predicate offense, apart from conflicting with the statutory language, yields consequences that would be at odds with what appears to have been congressional intent. The Second Circuit's view that section 924(c)(1) is ambiguous on the question must fail as well, since ambiguity certainly cannot be created by imposing on a statute a reading unsupported by either text or logic.[8]

Applying our interpretation of section 924(c)(1) to the facts of this case, we find that the district court did not err in sentencing Camps to forty-five years imprisonment. Each of the illegal acts for which Camps received a separate sentence was consummated before the next one was initiated: the December 29 shooting of Detroit Red was confined to that day alone; so too was the January 7 ambush of Brown's henchmen; and so too was the carrying of the five semiautomatic weapons on January 8. Cf. Blockburger v. United States, 284 U.S. 299, 301, 52 S.Ct. 180, 181, 76 L.Ed. 306 (1932).[9] Because there were three separate uses and/or carry-

ings of the weapons, Camps properly received five years for the first use, twenty years consecutive for the second, and twenty years consecutive for the third.[10]

The judgment entered on Camps' convictions is affirmed.

*AFFIRMED.*

---

**8.** In *United States v. Casey,* 776 F.Supp. 272 (E.D. Va.1991), the district court held that only one five-year sentence could be imposed under section 924(c)(1) if the government had linked multiple firearms violations to only one predicate offense. The district court based its holding on this circuit's decision in *United States v. Luskin,* 926 F.2d 372 (4th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 68, 116 L.Ed.2d 43 (1991). *Luskin,* however, does not dictate the conclusion reached in *Casey;* the precise question of the linking of multiple firearms violations to a single predicate offense was not before the court in *Luskin,* as the panel itself recognized. Having that question before us today, we reject the district court's interpretation of § 924(c)(1) in favor of our present holding.

**9.** The government has conceded, and for purposes of this case only we accept, that a defendant may not be punished multiple times for

simultaneous firearm use or carriage. *Cf. United States v. Freisinger,* 937 F.2d 383 (8th Cir.1991). Thus, Camps' convictions on counts 5 and 6 of the indictment, which related to the two guns fired at the ambush of Brown's henchmen, were merged for sentencing purposes, as were his convictions on counts 9 through 13, which involved the five weapons seized at the January 9 van stop. *See* Brief of the United States at 35 n. 12 ("Were the only issues the *simultaneous* use and carrying of the guns, *e.g.,* counts five and six or Counts nine through thirteen, the government would ... concede the issue [of multiple consecutive punishments].").

**10.** After *Deal v. United States,* — U.S. ——, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993), it is clear that a defendant may receive multiple, consecutive sentences under section 924(c)(1) in a single trial.